[No. G031724. Fourth Dist., Div. Three. Oct. 4, 2004.]

HELEN A. CARTER, Plaintiff and Appellant, v.
CB RICHARD ELLIS, INC., et al., Defendants and Appellants.

**COUNSEL**

Girardi & Keese, John A. Girardi, Shahram Shayesteh; Law Office of Lawrence J. Lennemann and Lawrence J. Lennemann for Plaintiff and Appellant.

Wallace L. Rosvall, Robert W. Peyton, Ellis D. Reiter, Jr., and John T. Thornton for Defendants and Appellants.

**OPINION**

**IKOLA, J.**—A jury found defendant CB Richard Ellis, Inc. (defendant),[1] liable to Helen A. Carter (plaintiff) for age and sex discrimination based on her claim that defendant's company-wide administrative reorganization had caused a disparate impact on women employees and those over the age of 40. The jury also found defendant liable for breach of an "oral or implied employment agreement" not to demote without good cause. Compensatory damages of $420,861 were awarded, to which the jury added $600,000 in punitive damages, for a total award of $1,020,861. The court denied defendant's motion for judgment notwithstanding the verdict (JNOV), but conditionally granted a new trial on the entire contract cause of action and on the amount of damages caused by the discrimination, unless plaintiff agreed to a reduced award of $420,861, comprised of $120,861 in compensatory damages and $300,000 in punitive damages. Plaintiff did not accept the remittitur. Defendant appeals the denial of its JNOV motion, and the denial of its motion for new trial on the liability element of the discrimination claim. Plaintiff cross-appeals the order granting a new trial.

We conclude the evidence was insufficient to establish a prima facie case of disparate impact sex or age discrimination or breach of contract. Defendant's posttrial JNOV motion should have been granted in its entirety. Thus, we reverse the judgment and remand for entry of judgment in favor of defendant.

FACTS

*Plaintiff's Job*

By all accounts, plaintiff was an excellent employee. First hired in 1969 as a word processing secretary when she was 21 years old, she worked for defendant continuously for some 30 years. During that period she was promoted several times, eventually to the dual position of regional administrative manager for defendant's Orange County region and administrative manager of defendant's Newport Beach office. Except for the year 1987, plaintiff received an increase in her compensation every year from 1984, when she was first made an administrative manager, through 1998.

---

[1] The complaint names both CB Richard Ellis, Inc., and CB Richard Ellis Services, Inc., as defendants. But the judgment was entered solely against CB Richard Ellis, Inc., and does not mention the disposition of the complaint against CB Richard Ellis Services, Inc. Nevertheless, the notice of appeal was filed on behalf of *both* entities, and the parties do not explain the relationship between them. We presume CB Richard Ellis, Inc., is the party aggrieved, and thus the only defendant entitled to appeal. (Code of Civ. Proc., § 902.) Accordingly, we will dismiss the appeal of CB Richard Ellis Services, Inc.

The duties of an administrative manager were multifaceted. As plaintiff described her job, the administrative managers "wore multiple hats, and the hats increased as time went on." Administrative managers were responsible for all of the personnel administration in the office, including hiring, training, and supervising of clerical support staff, deciding salary increases, counseling support staff, terminating staff when necessary, and administering employee benefits. They were responsible for controlling expenses, assisting with budget preparation, making sure the facility was operational, taking care of space needs in the office, dealing with the landlord, and, as computers came on the office scene, acquiring the computer expertise to assure support staff had the proper equipment to do their job. Plaintiff also characterized the job as that of a social director, responsible for employee relations and morale, and for arranging Christmas parties, summer picnics, social events for the clerical support staff, boat cruises, and bowling parties. Finally, administrative managers had to assure compliance with the Department of Real Estate requirements by reviewing closed transaction files against a 35-line checklist.

As of 1998, only one of the administrative managers was a male. More than half were over the age of 40. Of the 10 administrative managers in Southern California, all were female, and eight were over the age of 40. Most of the administrative managers were employees who had started out as secretaries and had then demonstrated abilities to take on additional responsibilities. When an open administrative manager position needed to be filled, nearly all of the applicants were women.

In late 1991, the administrative managers, including plaintiff, were made eligible to participate in defendant's "profitability bonus plan," effective in 1992. The profitability bonus plan set aside a percentage of the profits for each region of the company for distribution to the plan participants in that region. These profit-based bonuses were paid in the first quarter following the year in which the profits were accrued. Plaintiff's bonus started out with a relatively modest amount of $2,800 in 1992, but rose to $29,890 and $38,450 in 1997 and 1998 respectively. In those years, her base salary was, respectively, $53,000 and $55,000. Thus, the profit-based bonus became a significant part of her compensation. However, because the bonuses were based on the profitability of offices in each particular region, and because not all offices were as profitable as those in Orange County, approximately 20 percent of the administrative managers did not receive any bonus.

*The Reorganization*

In 1997, Brett White became the president of defendant's brokerage services division. Within a couple of weeks, White commenced planning a reorganization of the company. By written memorandum, he advised George Kallis and Ken Sanstad, the heads of the eastern and western divisions of the company, that he "would like to begin a process to create a short, mid and long-term plan for the Brokerage company." Inter alia, White "envision[ed] creating a small committee of no more than six people (including the two of you) to address the structure of the Brokerage company. Issues such as management roles, manager compensation and professional compensation (salary and bonus versus commission) will be key to this group's work." Kallis and Sanstad followed through by selecting a group of senior managers who, along with White, Kallis, and Sanstad, would constitute the strategic study committee. The committee asked for input from the nearly 10,000 company employees, interviewed dozens of clients, and also sought advice from outside consulting firms.

As relevant here, the study committee recommended the formation of eight to 10 regions to replace the existing two-region structure. A regional operations manager would head each of these "super regions," with five specialists in each region designated to handle accounting, legal support, marketing, information technology, and human resources. Under this plan, many of the former responsibilities of the administrative managers would be transferred to the functional specialists in each region.

The final reorganization plan divided the country into nine regions. As had been recommended, each region was to have five functional experts and a regional director, for a total of 54 new positions. It was also contemplated that some of the existing administrative managers would qualify for the new regional functional expert positions.

Although the administrative managers had begun to suspect that a change in their employment status was being contemplated, an official announcement was not made until November 1998. On November 10, 1998, plaintiff received a four-page memorandum, dated November 5, 1998, which advised her that "we will be transferring many of the responsibilities and duties which you, as an Administrative Manager, have performed to centralized regional positions." The memorandum further explained: "Effective January 1, 1999, we will be making the following changes in your employment: (i) your title will be changed to Office Services Administrator, a non-officer position . . . ; (ii) over the next several months your duties and responsibilities will be

changed so that ultimately, your duties and responsibilities will match the job description for the OSA position; (iii) your salary for 1999 will be your current base salary; and (iv) as an OSA, you are not eligible for a bonus." The memorandum made clear, however, that the 1998 bonus, payable in 1999, was unaffected. In addition, the memorandum offered an additional bonus of $15,000 if plaintiff chose not to leave the company and continued her employment until December 31, 1999.

About 15 of the 57 former administrative managers were eventually promoted to one of the new regional positions. Those promoted were all women and most were over the age of 40. Plaintiff applied for two of the new positions—regional director of operations, and director of human resources—but these jobs were filled by other women. In October 1999, plaintiff was offered a position as senior office services administrator at an increased salary, but she turned it down and resigned in November 1999. This lawsuit followed.

## DISCUSSION

### I

### Standard of Review

An "appeal from the trial court's denial of the . . . motion for judgment notwithstanding the verdict is a challenge to the sufficiency of the evidence to support the jury's verdict and the trial court's decision. The standard of review is essentially the same as when the trial court has granted the motion." (*Stubblefield Construction Co. v. City of San Bernardino* (1995) 32 Cal.App.4th 687, 703 [38 Cal.Rptr.2d 413].) In ruling on a motion for JNOV, " 'the trial court may not weigh the evidence or judge the credibility of the witnesses, as it may do on a motion for a new trial, but must accept the evidence tending to support the verdict as true, unless on its face it should be inherently incredible. Such order may be granted only when, disregarding conflicting evidence and indulging in every legitimate inference which may be drawn from plaintiff's evidence, the result is no evidence sufficiently substantial to support the verdict. [¶] On an appeal from the judgment notwithstanding the verdict, the appellate court must read the record in the light most advantageous to the plaintiff, resolve all conflicts in his favor, and give him the benefit of all reasonable inferences in support of the original verdict.' " (*Borba v. Thomas* (1977) 70 Cal.App.3d 144, 151–152 [138 Cal.Rptr. 565].)

## II

### Disparate Impact Discrimination

■ Plaintiff alleged she had suffered *disparate treatment* on the basis of her gender and age, and also alleged the administrative reorganization had caused a *disparate impact* on women and those over 40. But plaintiff abandoned the disparate treatment theory and elected to proceed solely on the basis of disparate impact discrimination. That choice eliminated plaintiff's need to prove a discriminatory motive for the reorganization, but made her burden more difficult in other respects. " 'Disparate treatment' is *intentional* discrimination against one or more persons on prohibited grounds. [Citations.] Prohibited discrimination may also be found on a theory of 'disparate impact,' i.e., that regardless of motive, a *facially neutral* employer practice or policy, bearing no manifest relationship to job requirements, *in fact* had a disproportionate adverse effect on members of the protected class." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354, fn. 20 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) Disparate impact discrimination has been recognized as actionable under both title VII of the Civil Rights Act of 1964 (Title VII) (42 U.S.C. § 2000e et seq.), and the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.). (See, e.g., *Griggs v. Duke Power Co.* (1971) 401 U.S. 424 [28 L.Ed.2d 158, 91 S.Ct. 849] [Title VII]; *Watson v. Fort Worth Bank and Trust* (1988) 487 U.S. 977 [101 L.Ed.2d 827, 108 S.Ct. 2777] (*Watson*) [Title VII]; *City and County of San Francisco v. Fair Employment & Housing Com.* (1987) 191 Cal.App.3d 976 [236 Cal.Rptr. 716] [FEHA]; *Ibarbia v. Regents of University of California* (1987) 191 Cal.App.3d 1318 [237 Cal.Rptr. 92] [FEHA]; *Harris v. Civil Service Com.* (1998) 65 Cal.App.4th 1356 [77 Cal.Rptr.2d 366] [FEHA].) "Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes." (*Guz v. Bechtel National, Inc., supra*, 24 Cal.4th at p. 354.)

### *As a Matter of Law, Plaintiff Failed to Present Evidence Establishing a Prima Facie Case of Disparate Impact Discrimination*

■ This case does not fit well within the normal boundary of a disparate impact case. Plaintiff asserts that defendant's reorganization caused a disparate impact on women and those over 40 because the reorganization plan demoted administrative mangers, all but one of whom were women, and about half of whom were over 40. Reflecting a basic misunderstanding of the

meaning of disparate impact, plaintiff lays great stock in her assertion that *"no other group of employees was adversely affected"* by the reorganization. But plaintiff proves too much. We take her assertion to mean that no woman or person over the age of 40 was adversely affected *unless* she was an administrative manager. Women were not affected as a group. Persons over 40 were not affected as a group. Rather, administrative managers were affected as a group. The evidence reveals nothing more. And the law does not prohibit discrimination against administrative managers.

Plaintiff's entire case proceeded on the erroneous premise that administrative managers were a "protected group" because administrative managers were almost all women and about half were over the age of 40. For example, plaintiff's written opposition to defendant's motion for nonsuit argued: *"Plaintiff was a member of a protected group, namely, Administrative Managers, who were predominantly women or persons over the age of 40."* On appeal, plaintiff continues this not-so-subtle swap of "protected groups." Plaintiff asserts she "presented substantial evidence of the disparate impact on Administrative Managers." And, indeed, she recites much evidence showing an adverse impact on administrative managers. We are reminded of a false syllogism. Gnatcatchers (a protected class) are brown (consists of women). The horses in the coral (the administrative managers) are brown (women). Therefore, the horses in the coral (the administrative managers) are gnatcatchers (a protected class). This lapse in logic—characterizing a category of employees as "protected" simply because employees in that category are part of a larger protected class—is the type of error Justice O'Connor warned against in *Watson*, discussed more fully, *post*. If a plaintiff can proceed with a disparate impact case on this basis, employers will necessarily hire by quotas in all job categories as the only means by which to avoid repeatedly justifying in a court of law the business necessity of every decision adversely affecting a segment of its workforce.

 The theory of disparate impact discrimination had its origin in *Griggs v. Duke Power Co., supra,* 401 U.S. 424, a case decided under Title VII. In *Griggs*, the court concluded a facially neutral employment policy, such as a general aptitude test or a high school diploma requirement, could constitute actionable discrimination, even in the absence of discriminatory intent, where the application of the policy had a discriminatory impact, and the employment policy was not demonstrably related to the job for which it was used. Until 1988, when *Watson* was decided, the high court had applied

the disparate impact theory in Title VII cases where the employment practice or policy involved standardized employment tests or criteria.[2]

■ In *Watson*, however, the court decided disparate impact analysis may permissibly be applied to cases where, as here, subjective or discretionary employment practices are challenged. (*Watson, supra,* 487 U.S. at p. 991.) The defendant employer in *Watson* argued that while standardized tests could be "validated" to determine whether they correctly predicted actual on-the-job performance, the "validation" of subjective criteria was impracticable. According to this argument, the difficulty of validating subjective criteria as predictors of on-the-job performance would make it impossible for employers to defend themselves against a charge of disparate impact discrimination. Thus, the only way an employer could protect against expensive litigation would be to adopt "surreptitious quota systems in order to ensure that no plaintiff can establish a statistical prima facie case." (*Id.* at p. 992.)

The *Watson* court agreed "that the inevitable focus on statistics in disparate impact cases could put undue pressure on employers to adopt inappropriate prophylactic measures." (*Watson, supra,* 487 U.S. at p. 992.) And the court acknowledged the "extension of [the disparate impact theory] into the context of subjective selection practices could increase the risk that employers will be given incentives to adopt quotas or to engage in preferential treatment." (*Id.* at p. 993.) For this reason, and "[b]ecause Congress has so clearly and emphatically expressed its intent that Title VII not lead to [encouraging quotas]," the court thought it "imperative to explain in some detail why the evidentiary standards that apply in these cases should serve as adequate safeguards against the danger that Congress recognized." (*Id.* at pp. 993–994.)

■ The court instructed, "The plaintiff must begin by identifying the specific employment practice that is challenged," and observed this initial task "may sometimes be more difficult when subjective selection criteria are at issue." (*Watson, supra,* 487 U.S. at p. 994.) The court proceeded to discuss at great length the pitfalls encountered in proving causation, especially with statistical evidence. "Once the employment practice at issue has been identified, causation must be proved; that is, the plaintiff must offer statistical

---

[2] The *Watson* opinion lists these cases: *Albemarle Paper Co. v. Moody* (1975) 422 U.S. 405 [45 L.Ed.2d 280, 95 S.Ct. 2362] (written aptitude tests); *Washington v. Davis* (1976) 426 U.S. 229 [48 L.Ed.2d 597, 96 S.Ct. 2040] (written test of verbal skills); *Dothard v. Rawlinson* (1977) 433 U.S. 321 [53 L.Ed.2d 786, 97 S.Ct. 2720] (height and weight requirements); *New York City Transit Authority v. Beazer* (1979) 440 U.S. 568 [59 L.Ed.2d 587, 99 S.Ct. 1355] (rule against employing drug addicts); *Connecticut v. Teal* (1982) 457 U.S. 440 [73 L.Ed.2d 130, 102 S.Ct. 2525] (written examination). (*Watson, supra,* 487 U.S. at p. 988.)

evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group. . . . [S]tatistical disparities must be sufficiently substantial that they raise such an inference of causation." (*Id.* at pp. 994–995.) Without attempting to describe all "kinds of deficiencies in facially plausible statistical evidence" (*id.* at p. 997), the court noted as typical examples of such deficiencies "small or incomplete data sets and inadequate statistical techniques." (*Id.* at pp. 996–997.)

One year after *Watson* was decided, the Supreme Court reiterated its concern that disparate impact analysis was susceptible to misapplication, i.e., being applied in a way that would cause employers to hire by quotas. In *Wards Cove Packing Co. Inc. v. Atonio* (1989) 490 U.S. 642 [104 L.Ed.2d 733, 109 S.Ct. 2115], overruled by statute on an unrelated point under the Civil Rights Act of 1991 (Pub.L. No. 102-166 (Nov. 21, 1991) 105 Stat. 1071), the court held statistical evidence showing a high percentage of nonwhite workers in one job category (cannery workers), and a low percentage of nonwhite workers in another job category (noncannery workers), did *not* establish a prima facie case of disparate impact discrimination. Instead, where a hiring practice is being challenged, a comparison "between the racial composition of the qualified persons in the labor market and the persons holding at-issue jobs . . . forms the proper basis for the initial inquiry in a disparate-impact case." (*Id.* at pp. 650–651.) Otherwise, "any employer who had a segment of his work force that was—for some reason—racially imbalanced, could be haled into court and forced to engage in the expensive and time-consuming task of defending the 'business necessity' of the methods used to select the other members of his work force. The only practicable option for many employers would be to adopt racial quotas, insuring that no portion of their work forces deviated in racial composition from the other portions thereof; this is a result that Congress expressly rejected in drafting Title VII." (*Id.* at p. 652.)

█ Thus, the mere fact that each person affected by a practice or policy is also a member of a protected group does not establish a disparate impact. *Katz v. Regents of the University of California* (9th Cir. 2000) 229 F.3d 831 (*Katz*) is instructive. Under a contract with the United States Department of Energy, the University of California managed the work at two national laboratories. "Prior to 1961, the employees of these national laboratories were participants in the Public Employees Retirement System (PERS), a statewide retirement system administered by the State of California. Beginning in 1961, however, the University of California Retirement Plan (UCRP) was offered to new employees, and no other lab employees became members of PERS." (*Id.* at p. 833.) As part of a downsizing effort, the university offered an early retirement incentive program to UCRP members, but not to PERS members. (*Id.* at pp. 833–834.) To be eligible for the early retirement program, an

employee had to be at least 50 years old with at least five years of service. As one might expect, the evidence showed the average age of the PERS members was greater than that of the UCRP members. The evidence also established the average age of potentially eligible PERS members was 60.51 years.

The allegedly disadvantaged PERS members brought suit for age discrimination under both the Age Discrimination in Employment Act (29 U.S.C. § 621 et seq.) and FEHA, arguing the early retirement plan had a disparate adverse impact upon PERS members. But despite the fact that none of the PERS members could participate in the plan, the court noted that when taking account of the *total* population of the laboratories age 60 and over, only 27 percent were adversely affected by the university's decision. The court held this "statistical evidence is insufficient to raise an inference that the disparate impact fell upon employees by virtue of their membership in a protected age group." (*Katz, supra,* 229 F.3d at p. 836.)

Finally, the *Katz* court noted that numerous UCRP employees older than the average PERS member were offered the favorable retirement plan, and concluded "the factor that determines an employees' eligibility to participate in [the favored plan] is thus not an employee's age itself, but instead whether that employee is a member of UCRP." (*Katz, supra,* 229 F.3d at p. 836; see also *Rose v. Wells Fargo & Co.* (9th Cir. 1990) 902 F.2d 1417, 1424 [elimination of duplicative vice-presidents in special assets division following bank merger not prima facie evidence of disparate impact discrimination, even though older persons terminated at higher rate than younger persons]; *Beale v. GTE California* (C.D.Cal. 1996) 999 F.Supp. 1312, 1323 [prima facie case of disparate impact age and gender discrimination not proved where entire category of workers known as "frame maintainers" was eliminated, even though 97 percent were women and 98 percent were over the age of 40, because, inter alia, plaintiff failed to provide data about the gender and age of employees that remained after the reduction in force].)

■ Here, plaintiff failed to establish a prima facie case of disparate impact discrimination because her data set was incomplete, one of the potential failings of statistical proof mentioned in *Watson.* Plaintiff offered no evidence regarding the gender or age composition of *all* of defendant's employees. The evidence was entirely about the effect of the reorganization on the administrative managers, as though it were a group protected by law. The varnish of plaintiff's words about the law's prohibition of discrimination against women and those over 40 was used as a diversionary tactic to conceal the real complaint—an adverse employment action taken against a very limited subset of the protected group—not because of their status as members of the protected group, but because of their status as members of the limited

subset. Thus, plaintiff attempted to establish disparate impact by the same false logic as did the plaintiffs in *Katz*. But the *Katz* court recognized, and so do we, that disparate impact is not proved merely because all members of a disadvantaged subgroup are also members of a protected group.

Defendant employed close to 10,000 people. There was no evidence as to the gender and age composition of the entire work force. But assuming, for purposes of illustration, all of the administrative managers were adversely affected (which they were not), and assuming roughly half of the entire work force were either women or persons over 40 years old, and accepting the evidence that no group in the company other than administrative managers was adversely affected by the reorganization, we conclude a mere 1.14 percent of the women or persons over 40 suffered an adverse impact. Even if we assume only 25 percent of the total employee population was female or over the age of 40, a trifling 2.28 percent of the protected classes was affected. And, even more fundamentally, plaintiff did not present evidence of the total impact on women or those over 40. (See, e.g., *Beale v. GTE California, supra*, 999 F.Supp. 1312.) Without that evidence, a prima facie case is not established.

The court should have granted defendant's JNOV motion on the discrimination claims. At most, the evidence established a disparate impact on administrative managers—*not* a protected group such as women or persons over 40. As a matter of law, plaintiff failed to present a prima facie case of disparate impact discrimination.

### III

### Breach of Contract

Defendant argues the court also erred in denying its JNOV motion on plaintiff's cause of action for breach of contract. On her cross-appeal, plaintiff argues the court erred in granting defendant's motion for new trial. We conclude the court should have granted defendant's JNOV motion. In view of our direction to enter judgment in favor of defendant, plaintiff's appeal of the order granting a new trial is moot.

#### *The Evidence Was Insufficient to Establish a Contract—Either Express or Implied*

■ Plaintiff's third cause of action alleged she had a contract with defendant not to be demoted without good cause. The operative complaint does not explain whether the contract was written, oral, express, or implied-in-fact, but the jury was instructed on both express and implied-in-fact

contracts. The jury found, rather ambiguously, that plaintiff had proved "she had an oral or implied employment agreement with defendant that she would not be demoted in position or compensation." Of course, in the absence of a contract limiting the employer's termination (and demotion) rights, and in the absence of actionable discrimination or other violation of public policy, the employment relationship is at will, subject to being "ended by either party 'at any time without cause,' for any or no reason, and subject to no procedure except the statutory requirement of notice." (*Guz v. Bechtel National, Inc., supra*, 24 Cal.4th 317, 335; Lab. Code, § 2922.)

■ The court below was troubled by the lack of evidence supporting plaintiff's cause of action for breach of contract, saying: "The weight of the evidence that I heard at the trial did not at all preponderate in favor of such an agreement. . . . [¶] I have no hesitation in granting a new trial on that theory." Later, the court was even more forceful. With respect to the contract cause of action the court said: "I'm absolutely certain that that was not proven." Our view of the evidence (or the lack thereof) is congruent with the court's last remark. We too are "absolutely certain" plaintiff did not present evidence sufficient to sustain a finding of either an oral or an implied contract not to demote except for good cause. But the proper remedy under these circumstances was to grant defendant's JNOV motion—not a new trial.

Since the jury's verdict was ambiguous, we review the evidence that might support either theory—an oral contract or an implied-in-fact contract.

1. *There Was Insufficient Evidence of an Oral Contract*

First, plaintiff's assertion that an oral promise was made to her at the time she was hired in 1969, as a 21-year-old word processing operator, that she would not be demoted except for good cause, finds, at best, only a scintilla of support in the evidence. The record cited by plaintiff in support of her assertion does not contain evidence of such a promise. Plaintiff testified about her initial interview with Mr. Hirsch, defendant's "Resident Manager." Plaintiff recounted the following conversation. "I was told that there was a word processing position available. There were other positions in the operations at the time, but that the—word processing position applied to me; that it was a great place to work; that there was the opportunity to grow there; and that I would enjoy my employment there if I chose to take the position." When asked about any conversation about her proposed salary, plaintiff testified: "He cited what salary was available at the time and told me that there were annual increases based upon performance, and that as long as I did a good job, I would get merit increases based on my performance."

Plaintiff testified to her legal conclusion that she "had an implied contract" that allowed a change in job duties and responsibilities but "not demotion or

termination or adversely affect [*sic*] my—my employment." Following up, defense counsel asked: "In other words, Mr. Hirsch, in this 1969 conversation, told you that you were never going to get demoted?" Plaintiff responded: "That is correct." And when plaintiff was asked whether Hirsch told her she would "constantly get promoted up through the ranks," she answered: "He said as long as I did a good job and performed my responsibilities, I would continue to advance with the company."

█ Our search for substantial evidence in support of the judgment "does not mean we must blindly seize any evidence in support of the respondent in order to affirm the judgment. The Court of Appeal 'was not created . . . merely to echo the determinations of the trial court. A decision supported by a mere scintilla of evidence need not be affirmed on review.' [Citation.] '[I]f the word "substantial" [is to mean] anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable . . . , credible, and of solid value. . . .' [Citation.] The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record. [Citation.] While substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding." (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633 [29 Cal.Rptr.2d 191].)

█ Here, the evidence was insufficient to establish the alleged oral contract not to demote except for good cause. The only evidence offered in support of an *express oral contract* was plaintiff's testimony about her 33-year-old conversation with Mr. Hirsch, who while hiring her as a 21-year-old entry level word processing operator, simply said that "as long as [she] did a good job, [she] would get merit increases based on [her] performance." Plaintiff's conclusion that these words of encouragement constituted an enforceable promise that she would never be subject to a change of job assignment, that she would never be demoted from a job never promised to her (and which she would not obtain for another 15 years), or that her future job would never be reclassified for reasons unrelated to her individual performance, are speculative, conjectural, and patently *unreasonable*. We decline plaintiff's invitation to accept this testimony as substantial evidence of an express oral agreement. If employers are held to have promised newly hired employees a *lifetime* of employment, with no adverse bumps in the road, based on such vague words of encouragement, not only will employers be required to withhold all words of encouragement for fear of actionable consequences, we will have diminished the integrity of the law of contracts. Promises should be enforced where certain and supported by consideration. But enforcing supposed promises of the type here alleged would make a

mockery of the law of contracts, and would elevate something best described as the law of unintended consequences to an undeserved place of honor in our law.

### 2. *There Was Insufficient Evidence of an Implied-in-Fact Contract*

The evidence in support of plaintiff's alleged implied-in-fact contract was also lacking. The fact that plaintiff, on appeal, continues to refer to her alleged contract as an "oral and/or implied in fact contract," reflects the ambiguity of the jury's verdict—ultimately the result of fuzzy reasoning. *Guz v. Bechtel National, Inc., supra*, 24 Cal.4th 317, is determinative. The *Guz* court held that "longevity, raises and promotions are their own rewards for the employee's continuing valued service; they do not, *in and of themselves*, additionally constitute a contractual guarantee of future employ ment security." (*Id.* at p. 342.) In *Guz*, the court acknowledged that the employer's written documents set forth implied contractual limits on the circumstances under which workers would be terminated. But the documents did not restrict the employer's freedom to reorganize its workforce "for whatever reasons it wished." (*Id.* at p. 338.) The *Guz* court concluded, "Whatever rights [the written policy] gave an employee threatened with replacement on account of his or her *individual* poor performance, we see nothing in Bechtel's personnel documents which, despite Bechtel's general disclaimer, limited Bechtel's prerogative to *eliminate* an *entire work unit*, and thus its individual jobs, even if the decision was influenced by a belief that the unit's work would be better performed elsewhere within the company." (*Id.* at p. 348.)

Here, plaintiff has not presented any evidence suggesting defendant contractually limited its right to reorganize its administrative operations in any manner it saw fit. On our review, we find *no* evidence establishing, suggesting, or from which a reasonable inference may be drawn, that any such implied contractual rights were ever created. The *Guz* opinion is on point and cannot be distinguished. Defendant's JNOV motion on the contract cause of action should have been granted.

### DISPOSITION

After 30 years of service, we can understand how plaintiff was disappointed and angered by her employer's decisions. The jury no doubt was also angered by what they may have perceived as defendant's unfeeling and perhaps even unwise business decision that adversely impacted plaintiff as an administrative manager. But plaintiff failed to establish any legally cognizable basis for the jury's verdict. The court's failure to set it aside in its entirety constituted error. The judgment is reversed and remanded with directions to

enter a new judgment in favor of defendant CB Richard Ellis, Inc. The appeal of CB Richard Ellis Services, Inc., a party not aggrieved by the judgment, is dismissed. Defendant CB Richard Ellis, Inc., shall recover its costs on appeal.

Sills, P. J., and Aronson, J., concurred.

The petition of appellant Helen A. Curtis for review by the Supreme Court was denied January 26, 2005. George, C. J., did not participate therein.