Filed 4/22/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| GRAIL SEMICONDUCTOR, INC., | H038714 |
| Plaintiff and Appellant, | (Santa Clara County<br>Super. Ct. No. 1-07-CV098590) |
| v. | |
| MITSUBISHI ELECTRIC &<br>ELECTRONICS USA, INC., | |
| Defendant and Appellant. | |

After a jury reached a verdict in favor of plaintiff Grail Semiconductor, Inc. (Grail) on Grail's action for breach of contract, the trial court ordered a new trial on damages, at the request of defendant Mitsubishi Electric & Electronics USA, Inc. (Mitsubishi). Both parties appeal. Mitsubishi contends that (1) the court should have ordered judgment notwithstanding the verdict (JNOV) instead of a new trial because Grail failed to establish the element of damages, and (2) the court should at least have granted a new trial on liability for breach of contract because it had prejudiced Mitsubishi's defense by admitting untrustworthy hearsay documents as business records. In its appeal Grail contends that the court erred by refusing to grant it injunctive relief. We find no prejudicial error and therefore must affirm the orders.

*Background*

The issues in this action revolved around the disclosure of a new technology in memory chip design created by inventor Donald Stern, cofounder of Grail. Before Stern's invention there were three kinds of memory: SRAM (static random access

memory), which is fast but large and expensive; DRAM (dynamic random access memory), which is small and cheap but requires more power and, like SRAM, is volatile (i.e. it loses data when electric power is removed); and FLASH (or "flash") memory, which is nonvolatile (i.e., retains the information even if the electrical power is removed), but relatively slow. Stern's idea was to combine the strengths of those three memory types—"the density of DRAM, [the] speed of SRAM and the non-volatility of FLASH"-- in a single chip. Witnesses expressed the view that if the design worked, it would be revolutionary, using words like "disruptive" (a "unique" innovation with "great utility" which "totally changes the market") and the "Holy Grail" of memory technology.

Stern's invention used the property of inductance, which occurs "when current passes through a wire, [causing] a magnetic field to form. And then when the current stops, the magnetic field collapses." "Inductance" had always been considered a "bad thing," an effect to be eliminated; it created extra signals and caused electrical noise and errors to occur in the circuits. Stern's departure from this "conventional wisdom" involved "figuring out how to take the inductive force and actually using it to accelerate the storing of the charge into the layers to allow the device to operate much, much faster." Stern obtained a patent for his design, which he called an "inductive storage capacitor."[1]

In January 2000 Stern and his cousin Robert Stern incorporated a start-up company in order to market Stern's technology. Between the last quarter of 2000 and the first quarter of 2003 Grail unsuccessfully tried to recruit investors in the company. By March of 2001 Grail had run out of money.

---

[1] A capacitor, Stern explained, is an electronic device used to store charge. An "inductive capacitor" involves "taking a capacitor and adding the inductive force to the capacitor to actually make it store and retain the charge and actually run faster."

In the morning of April 19, 2001, Stern and Grail met with two representatives of Mitsubishi, Ryuichi Matsuo and Kazutoshi Hirayama,[2] along with representatives of two other companies-- Global Alliance, a "finder" for Mitsubishi, and Asia Star Ventures, a consulting company that introduced Silicon Valley startups to Asian companies. Also in attendance were Terry Speizer, the Grail president and chief operating officer; and Mark Speizer, its chairman and chief executive officer. At the meeting, Matsuo signed a Nondisclosure Agreement (NDA) which required Mitsubishi "to keep in strict confidence and trust and not use, disclose or make available to others, including any of its affiliates or third parties any 'Proprietary Information' and 'Company Documents and Materials' (together 'INFORMATION') without the prior written consent of [Grail]."

Grail then gave a PowerPoint presentation describing the technology, including the concept of the use of inductive force. Witnesses gave conflicting testimony about whether any of the information presented at the meeting was confidential. Both Speizers maintained that Stern had always refused to disclose the details of his technology to anyone, including them; indeed, he appeared to be extremely concerned that someone would try to steal his ideas, and he would not agree to have it tested for investors.

Stern testified that in the afternoon the group met again in Grail's San Jose office. But both Speizers asserted that there was no afternoon meeting in Grail's office; by that time the office had already been closed to save money. According to Stern, they split up into two groups, and he met privately with Hirayama while the Speizers met with Matsuo about the business plan. During this second meeting, Stern said, he disclosed to Hirayama 16 items of confidential information. Stern showed Hirayama drawings that had been submitted with the patent application and explained the "concept of [using]

---

[2] Matsuo and Hirayama were "expatriates" of Mitsubishi's Japanese parent company, Mitsubishi Electric Company, often referred to as MELCO or Mitsubishi Japan. They were considered "employees of both Mitsubishi US and Mitsubishi Japan."

inductance to store electronic charges."  Hirayama took extensive notes in Japanese and made copies of Grail's drawings, including some of the patent application drawings.

Grail's efforts did not culminate in any outside investment or product development.  In June 2004, however, Stern read an article regarding technology promoted by Renesas Technology, which had been formed in April 2003 through a joint venture between Mitsubishi Electric Company ("Mitsubishi Japan"), the parent company of defendant Mitsubishi USA, and Hitachi, Ltd. ("Hitachi").[3]  At the time it was formed, 55% of Renesas was owned by Hitachi and 45% was owned by Mitsubishi Japan. Hirayama was one of the 143 Mitsubishi employees from the 320-employee Electronic Device Group who transferred to Renesas in 2003.  He remained there for seven months.

The 2004 article Stern saw discussed a new Renesas memory chip which Stern believed incorporated Grail's technology in violation of the NDA.  In June 2007 Grail initiated this action, alleging misappropriation of trade secrets, unfair competition, breach of contract, and related causes of action.  Its fifth amended complaint, the operative pleading at trial, filed in late 2009, stated only one cause of action, for breach of contract; it sought not only damages but injunctive and declaratory relief and a constructive trust.

During the 2012 trial extensive testimony was presented on two products publicized in 2004 by Renesas:  a new memory cell called SuperSRAM and its use of MONOS (metal, oxide, nitride, oxide silicon)[4] embedded flash memory in its microcontroller unit (MCU) devices.

---

[3] Renesas Technology became known as Renesas Electronics in 2010, after merging with NEC Electronics.

[4]  Defense witness Shinichi Minami, a former Renesas employee, described the acronym as including "semiconductor" rather than "silicon."  Plaintiff's expert Joseph McAlexander explained it as "metal, oxide, nitride, oxide, semiconductor or silicon."

Yuji Kihara, the designer of SuperSRAM, testified that he did not communicate with Hirayama or Matsuo about the design of SuperSRAM during his time at either Mitsubishi or Renesas. Kihara also stated that SuperSRAM did not combine the features of flash, DRAM, and SRAM. It improved the performance and solved the problems of conventional SRAM at reduced cost, but could not achieve "as high a density as flash or DRAM." Kihara did state that SuperSRAM had the same capacity as DRAM (larger than SRAM), and that "circuit wise it mainly uses DRAM." But he also explained the reduced soft error rate,[5] which was achieved through two capacitors rather than one, as in "the usual DRAM." Kihara obtained two patents for the SuperSRAM technology.

A critical part of Kihara's testimony regarding the SuperSRAM design was whether inductance was involved. Kihara stated that he did not contemplate its having an inductive effect, nor did testing reveal any. His product, he insisted, had "nothing to do with inductance."

The other semiconductor invention at issue was the new MONOS technology, co-developed by Shinichi Minami, another Hitachi employee who had transferred to Renesas in 2003, and his colleague, Professor Kamigaki. Minami brought with him the work he had focused on at Hitachi in developing the MONOS flash memory cell. He testified that the development of this technology was *not* performed in isolation from anyone else in the organization. He further stated, however, that the design of the product was finalized by October 2000, before Hirayama's meeting with Stern, although it was not ready for mass production until January 2004.

One of plaintiff's expert witnesses, Joseph McAlexander, examined the structures of both Renesas products and compared them to the Grail devices, with the assistance of

---

[5] Kihara explained "soft error" as a phenomenon that occurs when memory data are "destroyed due to radiation. And as SRAM grew smaller in size, the memory area also grew smaller so that this phenomenon increased in occurrence."

Chipworks, a respected company that used advanced optical techniques to analyze the components of electrical devices. In McAlexander's opinion, Mitsubishi had breached the NDA by disclosing Grail's confidential information to Renesas, which then used it for its products. SuperSRAM, he explained, appeared to be a composite device combining the features of DRAM and SRAM. Ten of the 16 items of confidential Grail information disclosed by Stern had appeared in the SuperSRAM chips, a "highly improbable" result. As to the MONOS MCU, while the design had, according to Minami, been finalized in late 2000, McAlexander explained that Renesas had "evolved it" so as to make it faster, with a "much smaller footprint." The MONOS memory structure, he stated, included an inductive capacitor, which allowed less energy to be used. Overall, in the MONOS product Renesas had "really developed a considerable competitive edge in terms of speed and power and retention as compared to competitors." And those critical changes were made to existing technology after the transition to Renesas in 2003. Of the 16 items of confidential information disclosed to Mitsubishi, 11 had been implemented in the MONOS embedded flash MCUs. Again, McAlexander said, it would be "highly improbable" that these 11 items would be found in a specific design without some prior knowledge.

Grail offered three measures of damages through the testimony of Joseph Gemini. Gemini first suggested that damages should be based on Grail's expectations consistent with its business plan—that is, the projected net cash flow, discounted by 15 percent, if Mitsubishi had bought the technology. That amounted to $123,898,889. A second approach, Gemini explained, was to calculate the royalty Mitsubishi would have paid for use of the technology, based on the *Renesas* sales resulting from that use. Discounted by 7.5 percent, that royalty (estimated as a lump sum) amounted to $203 million. A third measure was unjust enrichment, or "the benefit that Mitsubishi would have realized for taking . . . and using the technology unauthorized." That amount was a portion of the

6

operating profit that Renesas had realized from using the Grail technology, which was $252 million.

The jury found that Mitsubishi had breached the NDA Matsuo had signed at the outset of the April 19, 2001 meeting, and that Grail was harmed by the breach. In its verdict the jury determined damages to amount to $123,898,889.00. Judgment on the verdict was entered on May 16, 2012.

Mitsubishi moved for judgment notwithstanding the verdict (JNOV), attacking both the finding of breach and the measure of damages used by the jury. Mitsubishi also moved for a new trial, again asserting insufficient evidence of breach and excessive damages. It also challenged the admission of two Renesas website pages as exhibits, the exclusion of testimony about other products by its expert witness, and the court's refusal to give Mitsubishi's proposed special instruction on judicial admissions.

The trial court orally denied the motion for JNOV, finding substantial evidence to support the verdict on the issue of breach. It also denied Mitsubishi's new-trial motion on each ground except one: the jury had used an incorrect measure of damages, resulting in an excessive award. Mitsubishi then filed its notice of appeal.[6]

In its May 16, 2012 judgment on the jury verdict the court awarded prejudgment interest and injunctive relief. Mitsubishi moved to vacate the judgment, as it had been entered without support in either the law or the facts and because it had not had an opportunity to be heard on such relief. At a hearing on July 24, 2012, the court suggested that the grant of a new trial made unnecessary an order for interest or an injunction.[7] On July 27, 2012, the court issued a written order vacating the May 16 judgment. In the

---

[6] An order denying a motion for JNOV is appealable under Code of Civil Procedure section 904.1, subdivision (a)(4).

[7] Grail evidently had submitted a motion for prejudgment interest and an injunction, which was opposed by Mitsubishi. The motion itself is not in the appellate record.

7

order it formally denied the JNOV motion but found the issues of prejudgment interest and injunctive relief to be moot.

Grail challenged the court's finding as to the injunction, citing a provision for injunctive relief in the NDA and asserting the necessity of the remedy for Grail's future commercial opportunities. At a hearing on Grail's renewed motion for an injunction on September 7, 2012, the court agreed with Mitsubishi that Grail had not shown the likelihood of irreparable harm that could not be compensated by damages, particularly since Grail had agreed to an injunction followed by an immediate stay. The court filed its written order denying the request on September 18, 2012. Grail then filed a notice of cross-appeal.[8]

*Discussion*

*1. Mitsubishi's Appeal*

   *a. Denial of JNOV on Damages*

Mitsubishi first contends that the trial court granted the wrong remedy by ordering a new trial instead of JNOV. In its view, Grail simply failed to present sufficient evidence of damages, which required a defense judgment as a matter of law.

As both parties recognize, the purpose of JNOV is "to prevent the moving defendant from the necessity of undergoing any further exposure to legal liability when there is insufficient evidence for an adverse verdict." (*Fountain Valley Chateau Blanc Homeowner's Assn. v. Department of Veterans Affairs* (1998) 67 Cal.App.4th 743, 750.) "A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict,

---

[8] Grail filed its notice of appeal on September 10, 2012, after the court's oral ruling on September 7 but before it filed its written order. We will construe its notice to have been filed after the September 18 written order. (Cal. Rules of Court, rule 8.104(d)(2).)

8

that there is no substantial evidence in support. [Citation.]" (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.)

If the trial court had granted a new trial based on inadequacy of Grail's proof of the damages element of its claim, Mitsubishi would have a more tenable argument. (See *Carter v. CB Richard Ellis, Inc.* (2004) 122 Cal.App.4th 1313, 1327 [where weight of evidence did not support jury finding that contract existed, proper remedy was JNOV, not new trial]; *Garretson v. Harold I. Miller* (2002) 99 Cal.App.4th 563, 575 [JNOV properly granted where defect was in plaintiff's failure of proof rather than erroneous ruling by trial court].) But the court here made it clear that the excessive damages award resulted from the jury's application of the wrong *measure* of damages, not from insufficient evidence that Grail suffered damage.[9] The jury had obviously based its award on the *total* value of the technology Mitsubishi had disclosed to Renesas in violation of the NDA, measured by estimates of cash flows predicted by the business plan.

Relying on *Ajaxo Inc. v. E*Trade Group, Inc.* (2005) 135 Cal.App.4th 21, 55-57, the court explained that the correct measure of damages for breach of an NDA was the value of the benefit conferred on the defendant, which in this case was the value of the technology taken by Mitsubishi—but not the *total* value, because Grail still had the

---

[9] Grail's expert, Joseph Gemini, offered three alternative measures of damages. First, he said, "the damages should be based on what Grail's expectations were based on their business plan" and independent third-party evaluations of the technology—i.e., $123,898,889. Second, Gemini proposed a measure based on a royalty applied to the sales that used the Grail technology—i.e., $203 million. Third, he calculated unjust enrichment by determining the portion of Renesas's operating profit attributable to the use of the Grail technology from 2003 through 2012—i.e., $252 million. The jury's verdict was identical to the first estimate.

Mitsubishi's expert, Brian Nappert, also testified that the harm to Grail was "the value . . . of the state of the technology at the time of the April 2001 meeting." His estimate of damages was $2.1 million to $3.1 million. Under an unjust enrichment theory, he calculated the same amount.

9

ability to profit from its own technology. Instead, the jury should have determined damages according to the amount Mitsubishi would have paid on April 19, 2001 for a lump-sum, fully paid license to use the confidential information. The court also cited *Celeritas Technologies, Ltd. v. Rockwell Intern. Corp.* (Fed. Cir. 1998) 150 F.3d 1354, 1359-1360, where the appellate court held that the jury had properly determined damages based on the license fee the defendant would have paid had it not breached the parties' nondisclosure agreement, by calculating a reasonable royalty based on the defendant's sales forecasts. The court found further support for this position in the second Ajaxo case, *Ajaxo Inc. v. E\*Trade Group, Inc.* (2010) 187 Cal.App.4th 1295. There, as in this case, "Ajaxo retained possession of the secrets and could still license its technology to others. Under the common law, 'Where the plaintiff retains the use of the secret, as here, and where there has been no effective disclosure of the secret through publication the total value of the secret to the plaintiff is an inappropriate measure [of damages for misappropriation].' [Citation.]" (*Id.* at p. 1306.)

It is beyond question here that Grail established every element of breach of contract, including resulting harm. The court did not find insufficient proof of the existence of damages; it ruled only that the amount of those damages was calculated incorrectly and therefore warranted a new trial using the correct measure of value.

Mitsubishi argues that Grail has "waived any challenge" to the measure of value used by the jury by not cross-appealing on that ground. But Grail is not making any such challenge. Grail's point is only that substantial evidence of damages was presented through both parties' witnesses. As the issue will be retried, whether the original jury received sufficient evidence of damages under any particular measure is moot.

Mitsubishi attempted in its JNOV motion to refute the viability of Grail's second measure of damages, the amount of a royalty Mitsubishi would have paid for use of the technology. On appeal, Mitsubishi again raises that issue, contending only that the trial court "properly recognized that the evidence offered to support Mr. Gemini's opinion of

10

'what Mitsubishi would have paid for use of the technology' . . . was 'based entirely on speculation and unfounded assumptions.' "  But this argument again goes only to the state of the evidence presented rather than the legal viability of the measure at issue.  It also mischaracterizes the court's ruling.  The court did not state that the amount the breaching party would have paid to license the technology was an inappropriate measure of Grail's damages; on the contrary, it affirmed that measure as a guide to a damages calculation.  The court only declined to use *Celeritas* as a guide, because there a reasonable royalty could be estimated "based on the defendant's sales projections, the parties' own previous licensing practices, and the licensing practices of others in the modem industry."  Whereas in *Celeritas* the *defendant's* actual sales projections provided a basis for estimating the amount the defendant would have paid for a license, here no comparable basis existed for estimating what Mitsubishi would have paid for a license; what *Renesas* should have paid in royalties, calculated by Renesas's profits from its sales using Grail's technology, was irrelevant.  Thus, it was an error in the measure of damages that created the excess in the damages award, not simply a failure to prove any harm.  The grant of a new trial was accordingly made not to shore up the evidence but to establish a *legally* sufficient measure reflecting the "value of what [Mitsubishi] actually took from Grail," a measure the court defined as "the amount [Mitsubishi] likely would have paid for a license to use or transfer the technology."  Neither party has presented any reason on appeal to reject this theory of recovery.[10]

The third measure of damages, unjust enrichment, was also determined to be incorrectly used by Gemini in his calculations.  Again it was the measure, not the sufficiency of evidence, that the court rejected.  The $252 million figure Gemini cited

---

[10] We decline Grail's implicit suggestion that this court determine that *Celeritas* governs the proper measure of damages, as it is collateral to the issue raised by Mitsubishi in its appeal.

was based on profits from the sale of Renesas products containing Grail's technology, which, in the court's view, was not "a reasonable basis for estimating what [Mitsubishi] would have paid for a license to use technology disclosed subject to the NDA." No issue is presented contesting this ruling.

### b. *Admission of Documentary Evidence*

Mitsubishi next argues that the erroneous admission of two exhibits offered by Grail was prejudicial and necessitated a new trial on liability. At trial Grail called William Keeley, a senior director at Renesas, to testify as the Renesas company representative. Keeley was unfamiliar with the MONOS chip; he was therefore unable to confirm that Renesas's MONOS chip was an "inductive capacitor" or that it trapped electrons through "inductives"; indeed, he could not even "say for certain that the devices [he] sold used a MONOS structure." Grail attempted to elicit testimony that Renesas *represented* that its MONOS chip had an inductor; Keeley could not provide that affirmation. Grail then showed Keeley an exhibit referred to as PTX-20, which appeared to be a document from Renesas's European website. The court admitted the exhibit over Mitsubishi's objection on grounds of hearsay, lack of personal knowledge, and lack of authentication. Keeley nevertheless maintained that he was simply not familiar enough with the technology to state that the "inductor" representation in the document was accurate or inaccurate.

Grail then showed Keeley PTX-19, a similar document derived from Renesas's American website. Like PTX-20, this exhibit represented that the MONOS chip had an inductor. Mitsubishi did not object to the admission of PTX-19, though Renesas, which was monitoring the trial, did object, because the witness could not state "how the marketing department created [the document], whether the person who created it had a duty to create it in a certain way or to meet the business record exception." The court overruled the objection. Joseph McAlexander subsequently testified that PTX-19 showed that an inductor was part of Renesas's MONOS technology.

12

Mitsubishi responded with evidence suggesting that the word "inductor" in the websites was a mistranslation from the Japanese version, which should be translated as "dielectric," an insulating material that does not conduct electricity. Keeley explained that Renesas news releases were normally written in Japan and later translated before being sent to the United States and Europe, with various degrees of preliminary editing and occasional inaccuracies. In this case, he believed that a translation error had led to the use of the word "inductor" in PTX-20. An alternative translation contained in DTX-267 made more sense to Keeley; it used the word "dielectric" rather than "inductor." Shinichi Minami disagreed with even the representation that Renesas's MONOS chip trapped electrons by using an inductor; the word "inductor" in PTX-19, he insisted, was a mistranslation from the Japanese. Harry Tredennick, a defense expert, had obtained a certified translation and agreed with Minami and Keeley about the translation error. Tredennick suggested that the confusion resulted from the similarity of the Japanese characters used in "dielectric" and "inductor"; two of the characters were the same in the two words, while the third was different. Tredennick was convinced that there was no inductive storage capacitor in the MONOS MCU, though he agreed that any memory cell that did would be new and useful.

In its motion for a new trial Mitsubishi argued that PTX-19 and PTX-20 were erroneously admitted as business records. Keeley, it maintained, was not qualified to establish the trustworthiness of the documents, because (1) he was not the custodian of the websites or the documents themselves; and (2) he lacked knowledge of their creation, maintenance, or accuracy. The trial court, however, agreed with Grail that the documents qualified under the business records exception to the hearsay rule stated in Evidence Code section 1271. It also noted that Mitsubishi had not objected to PTX-19, and it found no prejudice in any event.

13

On appeal Mitsubishi renews its argument that the court should not have admitted these two "smoking gun" exhibits, because they were the "cornerstone of Grail's case" and contained highly prejudicial hearsay for which no exception existed.

Evidence Code section 1271, the hearsay exception cited by the trial court in its ruling, provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

The superior court found the documents admissible under this provision because the qualifying witness, William Keeley, had testified that PTX-20 had the "look and feel" of a Renesas marketing document and that PTX-19 "generally look[ed] the same" to him as PTX-20. Moreover, the URL on the documents indicated that they "did indeed come from Renesas's North American and European websites."[11]

Keeley's testimony was very general and thus could have been the ground for sustaining Mitsubishi's hearsay objection. But we agree with the superior court that the evidence of authenticity and trustworthiness supplied by Keeley's testimony was adequately supplemented by the URL notation on PTX-20, and by the original Japanese versions offered by Mitsubishi. And the court was correct that the foundational evidence need not be presented by the custodian of the record or the employee who personally prepared it. (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 324.) We see no abuse of the court's broad discretion in admitting the exhibits as business records under Evidence

---

[11] This appears to be true of PTX-20, but the copy of PTX-19 in the Appellant's Appendix does not contain a URL.

Code section 1271.  (Cf. *People v. Zavala* (2013) 216 Cal.App.4th 242, 245 [court has wide discretion in determining whether proper foundation was laid for admission under business records exception.].)

We further agree with the lower court that Mitsubishi has not shown prejudice.  A judgment of the trial court may not be reversed on the basis of the erroneous admission of evidence, unless that error was prejudicial.  (Code Civ. Proc., § 475.)  The record must show that the appellant "sustained and suffered substantial injury, and that a different result would have been probable if such error . . . had not occurred or existed. There shall be no presumption that error is prejudicial, or that injury was done if error is shown."  (*Ibid.*)  Additionally, article VI, section 13, of the California Constitution provides that a judgment may not be set aside based on the erroneous admission of evidence "unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."  Evidence Code section 353 reinforces that provision:  we may not reverse a judgment "by reason of the erroneous admission of evidence unless  . . . the error or errors complained of resulted in a miscarriage of justice."  (Evid. Code, § 353, subd. (b).)  "In civil cases, a miscarriage of justice should be declared only when the reviewing court, after an examination of the entire cause, including the evidence, is of the opinion that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."  (*Huffman v. Interstate Brands Companies* (2004) 121 Cal.App.4th 679, 692.)  In making this assessment "we are not to look to the particular ruling complained of in isolation, but rather must consider the full record in deciding whether a judgment should be set aside."  (*Waller v. TJD, Inc.* (1993) 12 Cal.App.4th 830, 833.)  The appellant bears the burden of establishing that the error was prejudicial.  (*Ibid.*)

In this case the jury heard abundant evidence, independent of PTX-19 and PTX-20, that Renesas's MONOS chip used an inductor, particularly through the testimony of Joseph McAlexander.  In addition, the challenged exhibits pertained exclusively to the

15

MONOS chip, while McAlexander's analysis of the SuperSRAM technology also suggested use of Grail's confidential information.  After admitting the exhibits the court allowed contrary defense evidence indicating that the word "inductor" in the exhibits was a mistranslation from the Japanese word for "dielectric."  The jury thus heard both sides of the issue, received documents purporting to be the same but in different languages, and reached a conclusion favorable to Grail.  Having examined the asserted error in light of the entire record, we cannot find prejudice from the admission of the challenged documents.  Consequently, the trial court did not err in declining to grant a new trial on liability.

*2.  Grail's Appeal*

As noted earlier, the trial court's initial judgment awarded Grail injunctive relief as requested in the second cause of action of the fifth amended complaint.  In its written order on the motions for JNOV and a new trial, the court found Grail's motion for pretrial interest and an injunction to be moot.  Grail submitted a renewed motion for an injunction (which, like the original motion, is not in the appellate record), but the trial court denied it by written order on September 18, 2012.  The court was unable to discern any threat of "irreparable harm," especially in view of Grail's agreement to a stay of any injunction that would be issued.

On appeal, Grail contends that it was entitled to an injunction upon the denial of Mitsubishi's motion for JNOV, because (1) the NDA provided for this remedy,[12] and

---

[12] Paragraph 9 of the NDA stated:  "Investor fully understands that a breach of any of the promises, duties, obligations and/or agreements contained in this Proprietary Information, Invention and Non-Disclosure Agreement will result in irreparable and continuing damage to the Company [i.e., Grail] for which there will be no adequate remedy at law. Accordingly, Investor further agrees that in addition to any and all remedies available at law and/or equity (including money damages), the Company shall be entitled to injunctive relief and/or decree for specific performance without the necessity of proving actual damages and that the Company shall be entitled to seek such equitable relief in any forum, including a court of law.  The Company may pursue any of the remedies

16

(2) it suffered "irreparable and continuing" harm through Renesas's successful use of Grail's technology."

"A permanent injunction is an equitable remedy for certain torts or wrongful acts of a defendant where a damage remedy is inadequate.  A permanent injunction is a determination on the merits that a plaintiff has prevailed on a cause of action for tort or other wrongful act against a defendant and that equitable relief is appropriate." (*Art Movers, Inc. v. Ni West, Inc.* (1992) 3 Cal.App.4th 640, 646.)

Civil Code section 3422 allows the court to grant a permanent injunction "to prevent the breach of an obligation existing in favor of the applicant: [¶] 1. Where pecuniary compensation would not afford adequate relief; [¶] 2. Where it would be extremely difficult to ascertain the amount of compensation [that] would afford adequate relief; [¶] 3. Where the restraint is necessary to prevent a multiplicity of judicial proceedings; or,  [¶] 4. Where the obligation arises from a trust."

"The first two grounds 'embody the requirement that to obtain an injunction a plaintiff ordinarily must show that the defendant's wrongful acts threaten to cause irreparable injury, meaning injury that cannot adequately be compensated in damages.' " (*DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.* (2009) 176 Cal.App.4th 697, 722 (*Kaleidescape*), quoting *Syngenta Crop Protection, Inc. v. Helliker* (2006) 138 Cal.App.4th 1135, 1167; see also *Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1352 [plaintiff seeking injunction "must ordinarily show that the defendant's wrongful acts threaten to cause *irreparable* injuries, ones that cannot be adequately compensated in damages"].)  "Irreparable harm may be established where there is the fact of an injury, such as that arising from a breach of contract, but where there is an inability to ascertain

---

described herein concurrently or consecutively in any order as to any such breach or violation, and the pursuit of one of the remedies at any time will not be deemed an election of remedies or waiver of the right to pursue any of the other remedies."

the amount of damage. In other words, to say that the harm is irreparable is simply another way of saying that pecuniary compensation would not afford adequate relief or that it would be extremely difficult to ascertain the amount that would afford adequate relief."  (*Kaleidescape*, *supra*, 176 Cal.App.4th at p. 722.)

Grail acknowledges the standard of review.  "The grant or denial of a permanent injunction rests within the trial court's sound discretion and will not be disturbed on appeal absent a showing of a clear abuse of discretion."  (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 390; *Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 912.)  The burden is on the party challenging the ruling to demonstrate such abuse.  (*Jameson v. Five Feet Restaurant, Inc.* (2003) 107 Cal.App.4th 138, 146.)

Here Grail failed to carry its burden to show that damages for Mitsubishi's breach would be insufficient to prevent any future harm.  It did not demonstrate that Mitsubishi was continuing to disclose information in violation of the NDA; its focus was on *Renesas's* use of the technology for Renesas products.  That conduct was itself the subject of a separate patent infringement action pending in federal court.

On this ground alone we must uphold the trial court's order.  That the parties' contract allowed for injunctive relief is not controlling; an injunction is an equitable remedy, which may be denied notwithstanding the parties' contractual stipulation if the remedy at law is adequate.  (See *Kaleidescape*, *supra*, 176 Cal.App.4th at p. 726, & fn. 6 [citing decisions in accord from other jurisdictions].)  As the facts in this record do not compel a conclusion as a matter of law that damages will be an inadequate remedy for Mitsubishi's breach of the NDA, we cannot find an abuse of discretion in declining to order injunctive relief.

*Disposition*

The orders are affirmed.  The parties shall bear their own costs.


_____
ELIA, J.


WE CONCUR:




_____
RUSHING, P. J.




_____
PREMO, J.

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court |
| Trial Judge: | Hon. Kenneth P. Barnum |
| Attorneys for Plaintiff and Appellant: | Davis Wright Tremaine and Martin L. Fineman |
| | Russell J. Hanlon |
| Attorneys for Defendant and Appellant: | Sidley Austin, Peter I. Ostroff, Mark E. Haddad and Michelle B. Goodman |