Filed 2/26/24  Wardak v. WLOW Partners CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BASTEL WARDAK, | |
| Plaintiff and Appellant, | G061606 |
| v. | (Super. Ct. No. 30-2015-00811563) |
| WLOW PARTNERS, LLC, et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Judge Randall J. Sherman.  Reversed and remanded.

Law Offices of William A. Markham and William A. Markham for Plaintiff and Appellant.

Brower Law Group and Lee K. Fink for Defendants and Respondents WLOW Partners, LLC, Dwaine K. Dirks and LJS Placentia Partners, LLC.

Samini Baric Katz, Bobby Samini and Ignacio J. Lazo for Defendant and Respondent Weiss Omar.

In 2013, respondents Dwaine K. Dirks and Weiss Omar formed WLOW Partners, LLC (WLOW) with appellant Bastel Wardak for the purpose of redeveloping an apartment building. Difficulties arose and, when the dust settled, WLOW had been dissolved and its only asset, the apartment building, was left solely in the hands of Dirks and Omar via a new LLC in which only they were members. Wardak was left with no ownership interest in the apartment building and was repaid only a fraction of the money he had advanced to WLOW to redevelop it. Wardak brought direct claims (on his own behalf) and derivative claims (on behalf of WLOW) against Dirks and Omar. Dirks, in turn, filed a cross-complaint against Wardak and Omar for breach of contract and against Wardak for fraud and negligent misrepresentation. Omar, for his part, filed a complaint against Wardak for declaratory relief. All claims other than those for declaratory relief, injunctive relief, and constructive trust proceeded to trial by jury.

The jury returned a special verdict, finding for Wardak on all claims against Dirks and Omar, against Dirks on his claims against Wardak, and for Dirks on his breach of contract and conversion claims against Omar. Although the jury specifically found Dirks breached his fiduciary duty to WLOW and both Dirks and Omar acted with malice, oppression, or fraud, the trial court granted judgment notwithstanding the verdict (JNOV) on those findings. Wardak appeals the amended judgment that followed.

We reverse the appealed portions of the amended judgment, as well as the underlying orders granting JNOV on Special Verdict Nos. 1, 2, 5, 22, and 24. As part of the amended judgment, the trial court conditionally ordered a new trial on the amount of punitive damages. That order was not appealed, and we remand the case for a new trial on that issue.

FACTUAL HISTORY

In May 2013, Wardak, Dirks, and Omar entered into a memorandum of understanding (MOU) to form WLOW for the purpose of redeveloping an apartment building in Placentia, California (the Property). The MOU called for creation of a formal

2

operating agreement based on the following terms: Dirks would contribute $465,000 of equity in the Property to WLOW, own a 50 percent interest in WLOW, and be WLOW's managing member. Wardak and Omar would "advance Dirks" a total of $50,000 upon execution of the operating agreement, plus $6,000 per month until the project received a certificate of occupancy. In addition, Wardak and Omar would provide WLOW a construction loan of approximately $1.5 million at 7 percent interest for year one and 6 percent interest for year two. Omar and Wardak would each own a 25 percent interest in WLOW.

Dirks and Omar had lived on the same cul-de-sac since 1988 or 1989. They were very good friends, who frequently socialized and sometimes traveled together. Between 1999 and 2008, they partnered on several real estate projects. Wardak knew Omar through Wardak's father. About a year after Wardak graduated from college, in 2005 or 2006, he began working for Omar in Omar's mortgage business. In August 2007, Omar and Wardak began a solar energy business together, which they owned 50/50. In the spring of 2013, Omar asked Wardak if he would be interested in pursuing a real estate venture with Dirks, and WLOW was born.

Although the MOU called for the creation of WLOW, Dirks had in fact already set up WLOW before the three men entered into the MOU. In July 2013, the three executed an "Amended and Restated Operating Agreement" (Amended Operating Agreement). The Amended Operating Agreement reflected a capital contribution from Dirks in the amount of $465,000, made him managing member, and gave him 50 percent equity in WLOW. Omar and Wardak were each given a 25 percent equity interest. Although the Amended Operating Agreement did not reflect any monetary contributions would be required from either Omar or Wardak, they paid the $50,000 and monthly $6,000 advances called for in the MOU.

Problems arose, the nature of which are not relevant to the issues raised by this appeal, and in January 2015, Dirks, Omar and Wardak revised the MOU and the

3

Amended Operating Agreement. Under the revised terms, each of them owned 33 percent of WLOW, and the monthly advance to be paid to Dirks increased to $8,500.

On May 15, 2015, Dirks, Omar, and Wardak executed a "Second Amended and Restated Operating Agreement of WLOW Partners, LLC" (Second Operating Agreement). The Second Operating Agreement set forth the following terms regarding Omar's and Wardak's obligations to provide financing for redevelopment of the Property: "Omar and Wardak collectively and together on a 50/50 basis must provide the balance of the construction financing in the amount of $1,735,872.00 plus interest . . . . These funds will be deposited collectively and together into a separate escrow account approved by [Dirks] within seven (7) days of execution of this Agreement. Should Omar and Wardak fulfill their obligations to fund the construction money, they will retain an ownership interest . . . . In addition, Omar and Wardak will continue to fund Dirks on a monthly basis . . . . [¶] In the event Members Omar and Wardak fail to provide the necessary funds for construction and funding Dirks as outlined above, the Manager [i.e., Dirks] may elect to dissolve the company . . . and obtain 100 percent Ownership of the Membership Interests of the company. In that event, any and all of Omar and Wardak's advances will revert to a non-interest bearing loan evidenced by promissory note, secured by the Memberships Interest only and subordinate to any future financing necessary to complete the project. Should the sale of the land or building take place thereafter, the 100 percent Owner, must first pay off all remaining debts, return any capital balance in his Capital Account, repay the advances by Omar and Wardak as evidenced by any subordinated note, with the remaining proceeds being distributed to the 100 percent Owners."

As reflected in the Second Operating Agreement, Omar and Wardak had by this point already advanced $605,538 to WLOW. Those advances were not made by Omar and Wardak individually, but by the solar energy business and related entities that Omar and Wardak owned 50/50.

4

Before the Second Operating Agreement was signed, Omar told Wardak he had the money for his share of the $1,735,872 and was prepared to bring a cashier's check for that amount with him to the meeting at which the Second Operating Agreement was to be signed.[1] In addition, Dirks sent an email to Wardak confirming Omar was prepared to contribute his share in cash. Dirks, however, admitted at trial that when he sent the email to Wardak, he knew Omar was not ready to fund.

Despite the assurances from Omar and Dirks, Wardak was concerned about including language in the Second Operating Agreement allowing Dirks to dissolve WLOW and take back the Property. He asked Dirks to remove the provision, and Dirks agreed to do so. When the three men met to sign the Second Operating Agreement, however, Dirks said the provision had not been removed because it would have been too much trouble to go back to the attorney to make the change. Dirks, however, assured Wardak the provision was irrelevant because Omar had come to the signing with his share of the money. Omar also confirmed to Wardak that he had a cashier's check with him for payment of his share. Wardak relied on these representations in signing the agreement. In fact, Omar did not have a cashier's check at that signing meeting.

Wardak understood the terms of the Second Operating Agreement required him to provide 50 percent of the total sum of $1.7 million and required Omar to pay the remaining 50 percent. Wardak understood he would not be obligated to pay Omar's half if Omar failed to pay.

Upon signing the Second Operating Agreement, Wardak gave Dirks a cashier's check from his personal account in the amount of $867,936 (half of the $1.7 million) made out to WLOW, LLC. Despite the written and oral promises, Omar did not provide any funding. Within five days, Wardak wrote to Dirks offering to put up Omar's

---

[1] For ease of reference, we refer to the $1,735,872 sum as "$1.7 million."

5

share, as Omar still had not offered any funds, stating "if [Omar] doesn't come through I still want to proceed and plan to step up to contribute his side of the funds . . . ." In response, Dirks encouraged Wardak to work with Omar to "bring in the funds necessary . . . ."

Dirks also informed Wardak the cashier's check he provided could not be cashed because it was made out to "WLOW, LLC" rather than to "WLOW Partners, LLC" and asked Wardak for a replacement check. Wardak agreed to get a new cashier's check once Dirks returned the original to him. Alternatively, Wardak offered to wire the funds once the original cashier's check had been redeposited into his account. Dirks agreed Wardak should wire the funds into a new escrow account he had created for WLOW once the original cashier's check had been redeposited.

Dirks returned the original cashier's check to Wardak about two weeks after the Second Operating Agreement was signed. After Wardak redeposited it in his own account, he asked Dirks about the new WLOW account into which he would be wiring the funds. Dirks said he could not open an escrow account until he had the money from Wardak and refused to provide escrow instructions so Wardak could wire the funds.

On June 15, 2015, Wardak emailed Dirks, stating the parties were at an impasse and proposing he and Dirks enter into a binding agreement on the following terms: (1) Wardak would reissue the cashier's check or wire funds for his half and those funds would be deposited into a construction escrow account and contributed to WLOW as a loan bearing 6 percent interest for a term of up to three years; (2) construction would proceed on the Property using the deposited funds; (3) Omar would be given an additional 30 days to fund his portion and, if he failed to do so, Wardak would fund the remaining $867,936, bring in another investor, or guarantee an institutional loan for that amount; (4) if Omar still failed to pay, he would be declared in default and Wardak would receive Omar's 25 percent membership interest in WLOW; and (5) Dirks would agree not to take the position Wardak was in default under the Second Operating

6

Agreement. On June 20, Dirks asked for a meeting of all three men, so Omar would have an opportunity to "'speak his piece'" and advise Dirks and Wardak how he wanted to proceed. Although Dirks testified such a meeting took place, there is no evidence of what was discussed.

On June 25, 2015, Wardak deposited $867,936, half of the $1.7 million, into a bank account under the name of WLOW Partners Construction Account. Wardak notified Dirks the funds had been deposited and asked if Dirks wanted him to transfer the funds to a different account. Dirks responded: "Since the Initial Contributions were not delivered to the Company within seven (7) days of execution of the Operating Agreement, I am forced to dissolve the company as outlined in Section 11 and 24(v) of the Operating Agreement . . . ."

Under the terms of the Second Operating Agreement, if Dirks elected to dissolve WLOW and take 100 percent ownership of the Property for himself, the monetary advances Omar and Wardak had already made were to be converted to a non-interest-bearing loan and repaid following the sale of the land or the building. In May 2016, rather than wait for the sale of the land or the building, WLOW, through Dirks, opened an escrow account for the purpose of repaying the amounts Omar and Wardak already advanced to WLOW, which had been converted to a loan to WLOW pursuant to the Second Operating Agreement.

The escrow administrator sent Wardak and Omar a form titled "Demand for Full Payment" for them to use to submit a demand for payment. Wardak made a payoff demand, claiming advances had been made in the amount of $623,575.02, plus interest, plus an additional $6,500. Wardak believed he was entitled to one-half of the amounts advanced. Thereafter, Omar also submitted a payoff demand, representing he was owed nothing because he had personally advanced $440,337.77 to the project and had already been repaid that amount by WLOW outside of escrow, leaving only $194,555.01 due to Wardak. Omar's claimed advances of $440,337.77 were based on calculations made by

7

Dirks. The escrow administrator accepted Omar's payoff demand and sent Wardak a check for $193,837.47 as payment in full for his share of the advances.[2]

Omar admitted at trial he did not personally advance the $440,337.77. Rather, that amount had been paid by the solar energy business and other entities Omar and Wardak owned 50/50. Omar also admitted WLOW did not pay him anything outside of escrow. Instead, at Dirks's request, Omar advanced the $440,337.77 he claimed he was owed by WLOW as a loan to another entity, LJS Placentia Partners, LLC (LJS Placentia). In return, Omar became a 49 percent owner of LJS Placentia. Dirks owned the remaining 51 percent. LJS Placentia was a new entity Dirks created to redevelop the Property after he dissolved WLOW.

Just days after the "payoff," Dirks transferred the Property to himself and then, in turn, to LJS Placentia. LJS Placentia—co-owned by Dirks and Omar—developed the Property and sold it for slightly more than $5 million.

Thus, when all was said and done, Dirks and Omar had managed, by virtue of Omar's "failure" to pay his agreed-upon amount under the Second Operating Agreement, to take the Property for themselves, strip Wardak of his ownership interest in WLOW, strip WLOW of the Property, and pay Wardak only a portion of the reimbursement of the advances to which he was entitled.

PROCEDURAL HISTORY

This action began with Wardak's complaint for declaratory relief, which he filed before the Property was transferred to LJS Placentia. By that complaint, Wardak sought a declaration he was entitled to maintain his ownership interest in WLOW. Over time, the complaint was amended, and by the time of trial, Wardak's operative pleading was the Second Amended Complaint. In it, Wardak sought declaratory relief against

_____

[2] The record does not reflect why the check sent to Wardak was slightly less than the amount reflected in Omar's demand for payment.

8

WLOW, Dirks, and Omar, as well as injunctive relief and imposition of a constructive trust against LJS Placentia. The Second Amended Complaint also alleged a direct claim of fraudulent conveyance and derivative claims of breach of fiduciary duty, intentional misrepresentation, and negligent misrepresentation against Dirks, as well as direct claims for breach of contract and conversion and a derivative claim for breach of contract against Omar.

Two other pleadings were filed in the action. Dirks filed a cross-complaint alleging claims for breach of contract against Wardak and Omar and claims for fraud and negligent misrepresentation against Wardak. Omar filed a complaint in intervention for declaratory relief, seeking a declaration allowing Dirks to wind up WLOW and convert any advances made by Wardak or Omar to debt.

The trial court reserved the claims of declaratory relief, injunctive relief, and constructive trust. As a result, only the following claims were tried to a jury: (1) Wardak's direct fraudulent conveyance claim against Dirks; (2) Wardak's direct breach of contract and conversion claims against Omar; (3) Wardak's derivative claims against Dirks for breach of fiduciary duty, intentional misrepresentation, and negligent misrepresentation; (4) Wardak's derivative breach of contract claim against Omar; (5) Dirks's direct breach of contract claim against Omar; and (6) Dirks's direct claims against Wardak for breach of contract, fraud, and negligent misrepresentation.

The trial court nonsuited Wardak's direct claim for fraudulent conveyance against Dirks before the matter was submitted to the jury. The jury found for Wardak on all his remaining claims; it also found for Wardak on Dirks's claims against him. After the verdict was delivered, the court nonsuited Wardak's derivative claims against Dirks for intentional and negligent misrepresentation.[3]

---

[3] Wardak initially appealed the trial court's ruling on his derivative claims of intentional and negligent misrepresentation but later withdrew that portion of the appeal.

9

The jury made special verdict findings on Wardak's claims, including the following findings relevant to this appeal: Dirks was not entitled to take 100 percent ownership of WLOW and its assets (Special Verdict No. 1); Dirks breached his fiduciary duty to WLOW (Special Verdict No. 2); Dirks caused $1.5 million in damage to WLOW (Special Verdict No. 5); Dirks acted with malice, oppression, or fraud (Special Verdict No. 22); Omar breached his contract with Wardak (Special Verdict Nos. 10 and 11); Omar wrongfully converted $123,900 of funds owed to Wardak on the promissory note (Special Verdict Nos. 12 and 13); and Omar acted with malice, oppression, or fraud (Special Verdict No. 24).

The jury found for Wardak on all of Dirks's claims against Wardak. It also found for Dirks and against Omar on Dirks's breach of contract claim against Omar and awarded Dirks damages of $870,000 on that claim.

The trial court then conducted a bench trial on the remaining equitable claims. On Wardak's direct claim for declaratory relief against WLOW, Dirks, and Omar, the court ruled the jury's award of damages to WLOW would be allocated, pursuant to the Second Operating Agreement, 50 percent to Dirks, 25 percent to Wardak, and 25 percent to Omar. The court ruled the remaining equitable claims were moot.

Subsequently, the trial court granted Dirks's motion for JNOV on Special Verdict No. 1 (the court found Dirks *was* entitled to take 100 percent ownership of WLOW and its assets) and Special Verdict No. 2 (the court found Dirks did *not* breach his fiduciary duty). Based on those rulings, the court found Special Verdict No. 5 (in which the jury awarded WLOW damages of $1.5 million from Dirks) was not applicable and Special Verdict No. 22 (in which the jury found Dirks acted with malice, oppression, or fraud) was moot.

The trial court also granted Omar's motion for JNOV on Special Verdict No. 24, which found Omar acted with malice, oppression, or fraud, and granted Omar's motion for new trial on the amount of damages awarded on Dirks's breach of contract

10

claim. The court granted the motions for JNOV on the findings of malice, oppression, or fraud as to both Dirks and Omar, thereby eliminating any award of punitive damages. Nevertheless, the court's judgment specified the amount of punitive damages awarded against both Dirks and Omar "would have to be set aside and a new trial conducted to determine the amount of punitive damages."

## DISCUSSION

The issues presented on appeal include the trial court's award of JNOV on Special Verdict Nos. 1, 2, 5, and 22 (the findings in favor of WLOW against Dirks), the JNOV on Special Verdict No. 24 (the finding in favor of Wardak against Omar), and the court's award of prejudgment interest to Dirks on his share of the damages owed to WLOW.[4]

### A. Standard of Review

"An 'appeal from the trial court's denial of the . . . motion for judgment notwithstanding the verdict is a challenge to the sufficiency of the evidence to support the jury's verdict and the trial court's decision. The standard of review is essentially the same as when the trial court has granted the motion.' [Citation.] In ruling on a motion for JNOV, '"the trial court may not weigh the evidence or judge the credibility of the witnesses, as it may do on a motion for a new trial, but must accept the evidence tending to support the verdict as true, unless on its face it should be inherently incredible. Such order may be granted only when, disregarding conflicting evidence and indulging in every legitimate inference which may be drawn from plaintiff's evidence, the result is no evidence sufficiently substantial to support the verdict. [¶] On an appeal from the judgment notwithstanding the verdict, the appellate court must read the record in the light

---

[4] Wardak initially appealed the court's award of JNOV on Special Verdict Nos. 3 and 4 (finding Dirks made intentional and negligent misrepresentations) but withdrew his appeal of those issues. Omar appealed the judgments entered in favor of Wardak and Dirks but abandoned the appeal, which was later dismissed by this court pursuant to a motion by Wardak.

11

most advantageous to the plaintiff, resolve all conflicts in his favor, and give him the benefit of all reasonable inferences in support of the original verdict."'" (*Carter v. CB Richard Ellis, Inc.* (2004) 122 Cal.App.4th 1313, 1320.)

*B. The Trial Court's Grant of JNOV on Special Verdict Nos. 1, 2, 5, and 22*

Before addressing the trial court's four challenged JNOV rulings on Special Verdict Nos. 1, 2, 5, and 22, we pause to note that the special verdict form was not a model of clarity. "[A] special verdict—if carefully drawn and astutely employed—may improve the quality of the factfinding process. It can focus the jury's attention on the relevant questions, incorporating the pertinent legal principles, and guiding the jury away from irrelevant or improper considerations. It can also expose defects in the jury's deliberations when they occur, providing an opportunity for the court to seek correction through further deliberations." (*Ryan v. Crown Castle NG Networks, Inc.* (2016) 6 Cal.App.5th 775, 795.) Here, the special verdict form did not break down the verdicts by cause of action; nor did it ask the jury to make findings of fact on the elements of the claims that were tried. (See Code Civ. Proc., § 624; *Trejo v. Johnson & Johnson* (2017) 13 Cal.App.5th 110, 136). The lack of detail in the special verdict form made the job of this reviewing court more difficult and may well have had a similar effect on the jury and trial court.

1. Special Verdict No. 1

In answering Special Verdict No. 1, the jury found Dirks was not entitled to take 100 percent ownership of WLOW and its assets.[5] The trial court granted JNOV on this finding. We conclude the court erred.

---

[5] Special Verdict No. 1 reads: "Was Dwaine Dirks entitled to take 100 percent ownership of WLOW Partners LLC and its assets?" The jury responded, "No." Because Wardak did not assert either a personal claim for breach of contract against Dirks or a direct (i.e., personal) claim against Dirks for breach of fiduciary duty, this special verdict finding can only be understood to relate to Wardak's derivative claim for breach of fiduciary duty, asserted on behalf of WLOW against Dirks.

The basis for the trial court's JNOV on this special verdict is, quite simply, its conclusion that the Second Operating Agreement permitted Dirks to do what he did. Specifically, paragraph 11 permitted Dirks to "dissolve the company . . . and obtain 100 percent Ownership of the Membership Interests of the company" if "Omar and Wardak fail to provide the necessary funds . . . as outlined above." The preceding language of paragraph 11 (the "as outlined above" part) provided "Omar and Wardak collectively and together on a 50/50 basis must provide the balance of the construction financing in the amount of [$1.7 million] plus interest . . . ."

The trial court apparently concluded (1) because Omar did not personally pay 50 percent of the $1.7 million, the contract/agreement permitted Dirks to dissolve WLOW and take the Property for himself, and (2) because Dirks had the right to do those things, Dirks could not possibly have done so in a manner that violated his fiduciary obligations to WLOW. We disagree.

On the evidence here, a jury could reasonably conclude Dirks availed himself of the remedies in paragraph 11—or, perhaps more accurately, placed himself in a position to invoke those remedies—in violation of his fiduciary duties. Indeed, in Special Verdict No. 2, which we address below, the jury found Dirks *did* breach his fiduciary duties to WLOW.

There is ample evidence to support a conclusion Dirks's dissolution of WLOW and taking of the Property for himself was a breach of his fiduciary obligations. This includes evidence Dirks: (1) falsely told Wardak that Omar had the funds ready to pay his share and would be bringing them to the signing of the Second Operating Agreement, even though Dirks knew Omar did not have the funds; (2) falsely told Wardak, when Wardak expressed concern with the very contract provision at issue—the term permitting Dirks to dissolve the LLC and take back the Property—that he would remove the provision and then, when he did not, falsely assured Wardak the provision would not affect him because Omar had his share of the payment in hand at the signing;

13

and (3) refused to accept Wardak's offers to pay the full $1.7 million, insisting that because the full amount had not been paid within seven days of the execution of the Second Operation Agreement, he was "forced" to dissolve WLOW and take the Property for himself. [6]

A reasonable jury could have found Dirks's conduct was a breach of his fiduciary duties. Dirks and Omar effectively colluded to cut Wardak out of any ownership in the Property by lulling Wardak into thinking (1) Omar would make his share of the payment when Dirks (and Omar) knew full well Omar did not intend to do so, and (2) Dirks would accept the entire $1.7 million from Wardak—all with the intention Dirks would take the Property from WLOW and transfer it to the new LLC, which happened to be owned by none other than . . . Dirks and Omar.

In short, even though the Second Operating Agreement allowed Dirks to dissolve WLOW and take the Property if he did not receive the entire $1.7 million sum, it certainly did not authorize him to place himself in a position to exercise that remedy by engaging in deceit, trickery, or other machinations vis-á-vis his fellow LLC members.

In any event, even if the answer to Special Verdict No. 1 were solely an issue of Dirks's contractual rights, it would still have been error for the trial court to grant JNOV. The court's pretrial ruling on Dirks's motion for summary judgment acknowledged the meaning of this portion of paragraph 11 was ambiguous and disputed.[7]

_____

[6] Dirks's suggestion he had no choice but to invoke the seven-day payment deadline is notably disingenuous given: (1) Wardak had both paid his half of the funds and offered to pay Omar's share, all within the seven-day window; (2) Dirks did not accept or cash Wardak's cashier's check, but he did not return it to Wardak for reissuance until well after the seven-day period had expired; and (3) long after the seven-day period expired, Dirks asked for a meeting with Wardak and Omar to continue to discuss payment of Omar's share. At a minimum, Dirks led Wardak to believe he had waived or otherwise would not enforce the seven-day payment period and would work with Wardak so that Wardak could fund Omar's share.

[7] The trial court's September 21, 2018 ruling on the motion for summary judgment read, in pertinent part: "Triable issues of fact remain as to the intent of the parties who entered

14

Dirks argued the contract provided the $1.7 million could *only* be paid one-half from Wardak and one-half from Omar. He testified he could not go forward unless both parties paid their separate share. Wardak argued the Second Operating Agreement permitted the funds to come from either (or both) of them, so long as Dirks received the full $1.7 million. To resolve this dispute over the intent and meaning of this payment provision, the court allowed evidence concerning the parties' understanding of the agreement and their contemporaneous conduct. There was substantial evidence to support a conclusion the parties intended and understood the contract as Wardak contends.

For starters, although Dirks testified the agreement required payment from both men, he also testified paragraph 11 would be satisfied so long as he received the total $1.7 million amount. Omar's contemporaneous conduct showed he, too, understood the money could come entirely from Wardak: Omar testified he told Wardak that if Wardak would pay the full $1.7 million, Omar would cede his ownership share of the Property to Wardak.

Wardak's contemporaneous conduct confirms he also understood that, under the Second Operating Agreement (as Dirks had assured him it would be interpreted and applied), he would not lose his ownership share of WLOW and the Property if Omar did not pay his half of the $1.7 million. Wardak's conduct was consistent with an understanding that he could opt to pay Omar's share of the $1.7 million and thereby acquire ownership of a full 50 percent interest in the Property. Within a few days of signing the Second Operating Agreement, Wardak told Dirks he would pay the full $1.7

---

into the May 15, 2015 [Second Operating Agreement], as to the meaning of 'collectively and together on a 50/50 basis' as applied to defendant Omar's acknowledged failure to pay his half of the promised [$1.7 million] for additional construction funding. Defendant Dirks believes it meant one thing, while plaintiff Wardak believes it meant something else."

15

million.  In fact, although Wardak made that offer more than once, Dirks never pursued or accepted Wardak's offer.

In sum, substantial evidence supports a conclusion that the parties contemporaneously understood that, so long as Dirks received the full $1.7 million— whether it was partly from Omar and partly from Wardak, or solely from Wardak—Dirks would not have the right to dissolve WLOW and take the Property for himself.  The evidence further supports a finding that, because Wardak was willing to pay the entire $1.7 million and Dirks did not accept his performance, Dirks did not have the right under the agreement to dissolve WLOW and take the Property for himself, precisely as the jury found.

We conclude the jury's finding that Dirks was not entitled to take 100 percent ownership of WLOW and its assets is supported by substantial evidence and the trial court erred in granting JNOV on Special Verdict No. 1.

2.  Special Verdict No. 2

On Special Verdict No. 2, the jury found Dirks breached his fiduciary duty to WLOW.[8]  Again, the trial court granted JNOV on this special verdict on the ground that, under the Second Operating Agreement, Dirks was entitled to dissolve WLOW and take its sole asset when Omar failed to pay his share of the $1.7 million.  We find this to be error.

An operating agreement "cannot relieve the [managing member] of [his] fiduciary duties in matters fundamentally related to the [LLC's] business."  (*BT-I v.*

---

[8]  Special Verdict No. 2 read:  "Did Dwaine Dirks breach his fiduciary duty to WLOW Partners LLC?"  The jury responded, "Yes."  The breach of fiduciary duty claim was brought by Wardak as a derivative claim.  In Dirks's appellate briefing, Dirks repeatedly argues Wardak did not have standing to bring a derivative claim on behalf of WLOW. That issue is not properly before us.  The trial court ruled Wardak had standing and, having failed to file an appeal or cross-appeal on the point, Dirks may not now claim error.  (*Celia S. v. Hugo H.* (2016) 3 Cal.App.5th 655, 665.)

16

*Equitable Life Assurance Society* (1999) 75 Cal.App.4th 1406, 1412 [decided in connection with identical fiduciary obligations owed by partners].)

As the managing member of WLOW, Dirks owed a fiduciary duty of loyalty and care to WLOW and its members, including Wardak. (Corp. Code, § 17704.09, subds. (a) & (f).) As the jury was instructed, Dirks had a duty to "act with the utmost good faith in the best interest of WLOW Partners LLC and its Members" and owed a duty of "undivided loyalty" to the LLC and its Members. (Corp. Code, § 17704.09, subds. (a), (d) & (f).) These instructions, which correctly state the law, are not challenged by any party on appeal. Pursuant to his duty of loyalty, Dirks was "obligated to act with the utmost loyalty and in the highest good faith when dealing with any member of the LLC, . . . [and could] not obtain any advantage over [any member of the LLC] by even the slightest misrepresentation or concealment." (*Feresi v. The Livery, LLC* (2014) 232 Cal.App.4th 419, 425 (*Feresi*).)

"The animating principle of a fiduciary's duties to his charges is unfaltering loyalty and honesty. 'Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A [fiduciary] is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the "disintegrating erosion" of particular exceptions [citation]. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd.'" (*Feresi, supra,* 232 Cal.App.4th at pp. 425–426.)

Dirks's fiduciary duties did not just extend to his fellow LLC members; they extended to the LLC itself. (Corp. Code, § 17704.09.) Because he owed a fiduciary duty to WLOW, Dirks was prohibited from "'acquiring, in opposition to the corporation, property in which the corporation has an interest or tangible expectancy or which is

17

essential to its existence.'" (*Kelegian v. Mgrdichian* (1995) 33 Cal.App.4th 982, 988.) "Whether or not a given corporate opportunity was wrongfully usurped is a question of fact to be determined from the facts and surrounding circumstances existing at the time the opportunity arises." (*Center for Healthcare Education & Research, Inc. v. International Congress for Joint Reconstruction, Inc.* (2020) 57 Cal.App.5th 1108, 1132.)

It is undisputed Dirks acquired WLOW's property to the detriment, indeed, the destruction, of WLOW. Wardak presented substantial evidence the acquisition was a wrongful usurpation of WLOW's opportunity. Wardak presented evidence he offered, at least twice, to pay Omar's share as well as his own to fulfill the $1.7 million payment obligation in the Second Operating Agreement and thereby keep the Property in WLOW's ownership. Dirks failed to accept those offers, which would have allowed WLOW to continue its ownership and operation of a property that ultimately proved to be worth more than $5 million. Further, it was undisputed Dirks ultimately transferred the Property from WLOW to a partnership he formed with Omar—the very individual whose supposed "failure" allowed Dirks to take over WLOW and transfer the Property. This evidence is more than sufficient to support the jury's finding that Dirks breached his fiduciary duty to WLOW.

Dirks argues on appeal he did not breach any fiduciary duty by transferring the Property and dissolving WLOW because he was allowed to do so under Corporations Code section 17704.09, subdivision (e). That statute reads: "A member does not violate a duty or obligation under this article or under the operating agreement merely because the member's conduct furthers the member's own interest." (*Ibid.*) Notably, Dirks did not cite Corporations Code section 17704.09 or make this argument at trial.

Even if we were to exercise our discretion to consider Dirks's new legal argument (*Esparza v. KS Industries, L.P.* (2017) 13 Cal.App.5th 1228, 1237–1238), we would find the argument unpersuasive. Corporations Code section 17704.09, subdivision (e) does not trump the duty of loyalty owed by an LLC member to the LLC. The statute

18

is designed only to allow fiduciaries to obtain incidental benefits "*without detriment*" to the entity. (*Feresi, supra,* 232 Cal.App.4th at p. 426, citing *Enea v. Superior Court* (2005) 132 Cal.App.4th 1559, 1564 [examining identical language found in Corp. Code, § 16404, subd. (e) relating to partnerships].) Dirks's conduct in taking the Property from WLOW—stripping WLOW of its only asset—and transferring it to himself can hardly be said to be an incidental benefit to Dirks or one that was bestowed on Dirks "without detriment" to WLOW.

Whether a fiduciary duty has been breached is a question of fact. (*In re Marriage of Kamgar* (2017) 18 Cal.App.5th 136, 144.) Because substantial evidence supports the jury's finding Dirks breached his fiduciary duty to WLOW, the trial court erred in granting JNOV on Special Verdict No. 2.

3. Special Verdict Nos. 5 and 22

Having granted JNOV on Special Verdict Nos. 1 and 2, the trial court found Special Verdict No. 5 (awarding WLOW damages of $1.5 million against Dirks) no longer applicable and Special Verdict No. 22 (finding Dirks acted with malice, oppression, or fraud) moot. Because we reverse the court's ruling on Special Verdict Nos. 1 and 2, we also reverse the court's conclusions that Special Verdict Nos. 5 and 22 are moot.[9]

Special Verdict No. 22's finding that Dirks's conduct—i.e., his breach of fiduciary duties to WLOW—was undertaken with malice, oppression, or fraud allows for an award of punitive damages. Pursuant to that finding, the jury awarded WLOW punitive damages against Dirks in the amount of $600,000 (Special Verdict No. 23). The

---

[9] On December 3, 2021, the trial court determined the $1.5 million awarded by the jury in favor of WLOW against Dirks [Special Verdict No. 5] and the $1.5 million awarded in favor of WLOW against Omar [Special Verdict No. 7] were duplicative and the jury "intended . . . to award a total of [$1.5 million] in damages, jointly and severally against Dirks and Omar." This finding was not appealed.

19

trial court's judgment found the punitive damages award moot based on its JNOV rulings but also conditionally set aside the punitive damages award and ordered a new trial to determine the amount of punitive damages because evidence was not presented at trial regarding Dirks's net worth.[10] That portion of the judgment was not appealed. Accordingly, the amount of punitive damages remains to be determined in further proceedings in the trial court.

*C. The Trial Court's Grant of JNOV on Special Verdict No. 24*

In Special Verdict Nos. 12 and 13, the jury found Omar, through his payoff demand, wrongfully converted $123,000 of Wardak's share of the repayment of the advances from the WLOW escrow account. The trial court did not disturb these findings and entered judgment against Omar based on them. None of the parties appealed this part of the judgment, so it is not before us. What is before us, however, is Wardak's appeal of the court's JNOV of the jury's finding, in Special Verdict No. 24, that Omar acted with malice, oppression, or fraud. The court granted Omar's motion for JNOV on Special Verdict No. 24, determining Omar "simply made a demand for payment from escrow in an amount which he supported by back-up documentation, and which he believed to be due to him, undercutting the jury's apparent finding of malice by clear and convincing evidence."

Civil Code section 3294, subdivision (a) provides punitive damages may be recovered "[i]n an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice . . . ." (*Ibid.*)

---

[10] It is not clear why the trial court, having granted JNOV on the jury's verdict that Dirks breached his fiduciary duty to WLOW and determined the jury's award of punitive damages based on that finding was moot, would both set aside the punitive damages award and order a new trial to determine the *amount* of punitive damages.

20

"[W]hen presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005, fn. omitted.) "Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at p. 996.)

The jury found Omar liable on Wardak's claim for conversion. Punitive damages are recoverable on a claim of conversion. (*Voris v. Lampert* (2019) 7 Cal.5th 1141, 1150–1151.) Punitive damages may be awarded where there is a finding, on clear and convincing evidence, of oppression, fraud, or malice. For purposes of punitive damages, fraud is defined as "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." (Civ. Code, § 3294, subd. (c)(3).)

Omar made a payoff demand, in which he represented he had personally provided $440,337.77 to WLOW for the Property and had been repaid that full amount by WLOW outside of escrow, leaving only $194,555.01 due to Wardak. Wardak made a payoff demand of $623,575.02, plus interest and an additional $6,500. He testified he was entitled to only one-half that amount. The escrow company made its payment to Wardak based on Omar's representations.

Omar admitted, however, his representations to the escrow company were false in two respects. First, he admitted the $440,337.77 came from entities he and Wardak owned 50/50, not from Omar personally. Second, he admitted WLOW had not

21

paid him anything outside of escrow, much less the $440,337.77 he claimed. Instead, the $440,337.77 supposed debt was rolled over into Omar's interest in LJS Placentia and a corresponding share of any profits arising out of the Property.

In sum, Omar's own testimony supports a finding that he deliberately made false statements to obtain from the escrow company funds he knew rightfully belonged to Wardak. We conclude substantial (in fact, clear and convincing) evidence supports a finding that, in so doing, Omar acted with fraud within the meaning of Civil Code section 3294, subdivision (c)(3). Accordingly, the trial court erred in granting JNOV on Special Verdict No. 24. The JNOV must be reversed, Special Verdict No. 24 reinstated, and the matter remanded for further proceedings on the amount of punitive damages.

## D. Award of Prejudgment Interest to Dirks

The jury found for WLOW on Wardak's derivative claim for breach of contract against Omar and awarded damages against Omar, and in favor of WLOW, in the amount of $1.5 million. Because the claim was derivative and WLOW had been dissolved, the trial court determined this award of damages against Omar would be divided pursuant to the ownership percentages in WLOW. That leaves Dirks receiving 50 percent of the damages award ($750,000) with Omar and Wardak each receiving 25 percent ($375,000).

Dirks does not appeal this finding; none of the parties did. But as part of the judgment, the trial court also awarded Dirks prejudgment interest in the amount of $250,273.97 on his share of the damages awarded to WLOW against Omar on the derivative breach of contract claim. Wardak appeals *that* award on various grounds. We conclude Wardak does not have standing to appeal a judgment ordering Omar to pay prejudgment interest to Dirks.

"[W]hether a party has standing to appeal is a question of law." (*Estate of Bartsch* (2011) 193 Cal.App.4th 885, 890.) Only an "aggrieved" party may appeal. (Code Civ. Proc., § 902.) A party is "aggrieved" only when that party's rights or interests

are "'injuriously affected'" by the judgment or order appealed from. (*Conservatorship of Gregory D.* (2013) 214 Cal.App.4th 62, 67 (*Gregory D.*).) "The injured interest must be 'recognized by law' [citation], and the injury must be 'immediate, pecuniary, and substantial'; it cannot be nominal or be ""'a remote consequence of the judgment.'""" (*Six4Three, LLC v. Facebook, Inc.* (2020) 49 Cal.App.5th 109, 115 (*Six4Three*).)

Wardak asserts he has standing to challenge the award of prejudgment interest to be paid by Omar to Dirks because Wardak is a "judgment-creditor of Omar, who is harmed by Omar's ability to use Dirks's judgment as a shield that protects him from Wardak's judgment." We conclude Wardak's claimed injury is a remote consequence of the judgment and not an immediate or substantial injury. Wardak is not an aggrieved party as to this portion of the judgment.

Further, "[t]he injured interest must also belong *to the party*: 'a would-be appellant "lacks standing to raise issues affecting another person's interests."'" (*Six4Three, supra,* 49 Cal.App.5th at p. 115.) "Injurious effect *on another party* is insufficient to give rise to appellate standing." (*Gregory D.*, *supra*, 214 Cal.App.4th at p. 67.) This doctrine "is no mere technicality, but is grounded in the most basic notion of why courts entertain civil appeals. We are here to provide relief for appellants who have been wronged by trial court error. Our resources are limited and thus are not brought to bear when appellants have suffered no wrong but instead seek to advance the interests of others who have not themselves complained. The guiding principle is one often encountered in daily life: no harm, no foul." (*Rebney v. Wells Fargo Bank* (1990) 220 Cal.App.3d 1117, 1132.)

We find Wardak lacks standing to appeal the trial court's award of prejudgment interest on a judgment to be paid by Omar to Dirks. That portion of Wardak's appeal is dismissed.

*E. Wardak's Request for Sanctions Against Omar*

Omar initially appealed the judgments entered against him in favor of Wardak and Dirks but later abandoned the appeal. In response, Wardak moved to dismiss Omar's cross-appeal and sought sanctions in connection with that motion. This court granted the motion to dismiss but reserved the issue of sanctions for determination in conjunction with the decision on appeal.

Code of Civil Procedure section 907 authorizes the imposition of sanctions when an appeal is "frivolous or taken solely for delay." (*Ibid.*) "[A]n appeal should be held to be frivolous only when it is prosecuted for an improper motive—to harass the respondent or delay the effect of an adverse judgment—or when it indisputably has no merit—when any reasonable attorney would agree that the appeal is totally and completely without merit. [Citation.] [¶] However, any definition [of a frivolous appeal] must be read so as to avoid a serious chilling effect on the assertion of litigants' rights on appeal." (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650.)

Wardak has not shown Omar's appeal was taken solely for delay or is frivolous. The motion for sanctions is denied.

DISPOSITION

The orders granting JNOV on the jury's Special Verdict Nos. 1, 2, and 24 are reversed. The related orders determining the jury's finding on Special Verdict No. 5 to be "not applicable" and the jury's finding on Special Verdict No. 22 to be moot are reversed. The jury's findings on Special Verdict Nos. 1, 2, 5, 22, and 24 are reinstated. The award of prejudgment interest to Dirks on his share of the damages owed to WLOW is affirmed. In all other respects, the amended judgment is affirmed. The matter is remanded for a new trial on the amount of punitive damages. Wardak shall recover his costs on appeal.

GOODING, J.

WE CONCUR:

O'LEARY, P.J.

BEDSWORTH, J.

25